UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Jane Doe

      v.                           Civil No. 07-cv-286
                                      Opinion No. 2008 DNH 058
Friendfinder Network, Inc.
and Various, Inc.

**O R D E R**

The plaintiff, proceeding pseudonymously, has sued defendants Friendfinder Network, Inc. and Various, Inc. on a number of claims arising out of the placement of allegedly false and unauthorized personal advertisements about her on their websites and others.  The defendants move to dismiss the plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that they are barred by the Communications Decency Act of 1996, 47 U.S.C. § 230, and otherwise fail to state a claim for relief.

This court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 (federal question and supplemental jurisdiction) and 1332(a)(1) (diversity).  The court heard oral argument on the motion on March 24, 2008.  For the reasons set forth below, the motion is granted as to Counts II-VI and VIII of the complaint; granted as to Count I of the complaint except insofar as it asserts an intellectual property claim for

violation of the plaintiff's right of publicity; and denied as to Count VII.

**BACKGROUND**

The defendant corporations operate a number of affiliated "web communities" where members can meet each other through on-line personal advertisements, including "AdultFriendFinder.com," which bills itself as "the World's Largest SEX and SWINGER Personal Community."  To participate, a user registers by entering a variety of personal information, creating an on-line profile that can be viewed by other members of the community. Portions of these profiles, known as "teasers," also appear on Internet search engines and as advertisements on other websites unaffiliated with the defendants'.

In June 2005, a profile of a female member under the screen name "petra03755" was created on the AdultFriendFinder site.  The profile identified the member as a recently separated 40-year old woman in the Upper Valley region of New Hampshire who was seeking "Men or Women for Erotic Chat/E-mail/Phone Fantasies and Discreet Relationship."[1]  To create the profile, "petra03755" entered a

_____

[1] The Upper Valley region of New Hampshire encompasses a number of towns along or near the Connecticut River in Sullivan and Grafton Counties, including Hanover, the home of Dartmouth College.

variety of information on her sexual proclivities into an on-line form provided by the website.  She also provided biographical data, such as her birth date, height, build, and hair and eye color, and submitted a nude photograph, purportedly of herself.

The plaintiff alleges she had nothing to do with creating the profile, that she does not engage in the "promiscuous sexual lifestyle" or the "perverse" sexual activities it describes, and that the photograph does not depict her.  Nevertheless, she claims that the biographical information and photo "reasonably identified" her as "petra03755" to people in her community.  The plaintiff does not know the true identity of the user who created the profile--only that he or she accessed the AdultFriendFinder website through the Dartmouth College computer network using an e-mail address provided by Yahoo!.  The plaintiff complains that the defendants "took special pains" to ensure the anonymity of those posting on the AdultFriendFinder site and did nothing to verify the accuracy of any of the information posted.

The plaintiff says that she did not learn of the profile until more than a year after its creation, when an acquaintance let on that she had been discussing it with other members of the plaintiff's circle who believed the profile to be hers.  In the meantime, the plaintiff alleges, the profile deceived consumers into registering for the defendants' on-line dating service in

order to meet her.  After the plaintiff contacted the defendants about the offending profile, they agreed to remove it from the AdultFriendFinder site.  As a result, when other members thereafter attempted to access the profile, the site displayed the message, "Sorry, this member has removed his/her profile." The plaintiff asserts that this message was itself false in communicating that she was a member of the service and that the profile had been hers in the first place.[2]  She further faults the defendants for doing nothing to inform other users that the profile "had in fact been bogus and false."

For several months after the plaintiff's initial complaints, the profile allegedly continued to appear, with slight modifications, on other similar websites operated by the defendants.[3]  In addition, the defendants allegedly caused portions of the "petra03755" profile to appear as "teasers" on Internet search engines and advertisements on other third-party

---

[2] The plaintiff also alleges that the defendants later identified "petra03755" as a "Standard Member" of one of their affiliated sites, LesbianPersonals.com.

[3] At oral argument, the plaintiff did not identify any differences between these "modified" profiles and the original version that appeared on the AdultFriendFinder site, other than a change in "petra03755"'s age from 40 to 41 or "early 40s."  No other difference is apparent from either the samples of the teasers attached as exhibits to the complaint or the allegations of the complaint itself.

websites, including "sexually related" ones.  The search engines retrieved the teasers when users entered search terms matching some of the information in the profile, including true biographical information about the plaintiff.  The advertisements appeared when the third-party website recognized a user's location as near the Upper Valley region of New Hampshire. Through hyperlinks, these teasers and advertisements served to direct Internet traffic to the defendants' own websites, allegedly increasing their profitability.

The plaintiff's complaint sets forth eight numbered counts against the defendants:

- "Invasion of Property/Intellectual Property Rights" (Count I);

- Defamation (Count II);

- "Intentional/Negligent/Reckless Conduct" (Count III);

- "Dangerous Instrumentality/Product" (Count IV);

- Intentional infliction of emotional distress (Count V);

- Violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A (Count VI);

- False designations in violation of the Lanham Act, 15 U.S.C. 1051 et seq. (Count VII); and

- "Willful and Wanton Conduct" (Count VIII).

She claims a variety of harm:  damage to her reputation; further alienation from her husband, embarrassment, loss of "important

employment opportunities," resources expended investigating and rectifying the false profile, and emotional distress, including anxiety over the lingering effect of the false profile, which has allegedly necessitated psychological treatment.  In addition to compensatory damages, the plaintiff seeks injunctive relief requiring the defendants to notify the public of the circumstances giving rise to the appearance of the profile on their websites, among other remedial measures.

**ANALYSIS**

**I.   Applicable legal standard**

"A complaint should not be dismissed unless it is apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  <u>Stanton v. Metro Corp.</u>, 438 F.3d 119, 123-24 (1st Cir. 2006) (internal quotation marks omitted).  In ruling on a motion to dismiss for failure to state a claim, the court must accept the well-pleaded factual allegations of the complaint as true, drawing all reasonable inferences in the plaintiff's favor.  <u>Id.</u> at 123. Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  <u>Cepero-Rivera v. Fagundo</u>, 414 F.3d 124, 129 (1st Cir. 2005) (internal quotation marks omitted).

6

The burden is on the defendant to make this showing.  See, e.g., Directv, Inc. v. Treesh, 487 F.3d 471, 475 (6th Cir. 2007), cert. pet. filed, No. 07-1004 (S. Ct. Jan. 31, 2008).

## II.   Whether the Communications Decency Act bars the plaintiff's state-law claims

Under the Communications Decency Act ("CDA"), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service," id. § 230(f)(3).  The CDA further dictates that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Id. § 230(e)(3).  These provisions bar state law claims against interactive computer services for publishing content obtained from another information content provider.  See Universal Comm'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007); see also Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., ___ F.3d ____, 2008 WL 681168, at *4 (7th Cir. Mar. 14, 2008); Carafano v. Metrosplash.com, Inc., 339 F.3d 1119,

1120 (9th Cir. 2003); <u>Green v. Am. Online (AOL)</u>, 318 F.3d 465, 470-71 (3d Cir. 2003); <u>Ben Ezra, Weinstein & Co. v. Am. Online, Inc.</u>, 206 F.3d 980, 986 (10th Cir. 2000); <u>Zeran v. Am. Online, Inc.</u>, 129 F.3d 327, 330 (4th Cir. 1997).  But the CDA also provides that it "shall [not] be construed to limit or expand any law pertaining to intellectual property."  47 U.S.C. § 230(2).

The defendants argue that all of the plaintiff's state law theories of recovery are barred by the CDA.  The plaintiff responds that the Act does not bar her state law claims because (1) they arise out of the defendants' own statements, which are not protected by the Act, and (2) her claim for invasion of privacy is premised on a "law pertaining to intellectual property" unaffected by the Act.  The Court will address these contentions in turn, assuming for purposes of the defendants' first argument that § 230(2)'s "intellectual property exception" does not apply to the plaintiff's claims.

**A.   <u>The state law claims (other than invasion of privacy)</u>**

In <u>Universal</u>, the First Circuit instructed that "Section 230 immunity should be broadly construed" so as to effectuate what it identified as "Congress's 'policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other

8

parties' potentially injurious messages.'"[4]   478 F.3d at 418-19

(quoting <u>Zeran</u>, 129 F.3d at 330-31 (ellipses by the court)).   To

achieve this goal, the court reasoned, § 230 "immunity extends

beyond publisher liability in defamation law to cover any claim

that would treat [a service provider] 'as the publisher,'" <u>id.</u> at

420, regardless of the plaintiff's theory of action, <u>id.</u> at 418.

This immunity, as construed by the First Circuit, plainly

extends to a number of the acts and omissions alleged in the

plaintiff's complaint.  For purposes of the appearance of the

profile on the AdultFriendFinder website, the plaintiff does not

question that each of the defendants qualifies as a "provider or

user of an interactive computer service" or that "petra03755"

qualifies as "another information content provider" within the

meaning of § 230.  Thus, because the only role the defendants

played in the initial appearance of the profile was as the

publisher of information supplied by "petra03755," the plaintiff

---

[4] Congress made this choice, the court explained, because
this species of liability would tend to chill speech over the
Internet, "given the volume of material communicated through such
intermediaries, the difficulty of separating lawful from unlawful
speech, and the relative lack of incentives to protect lawful
speech."  <u>Universal</u>, 478 F.3d at 419-20.  Furthermore, the court
observed, Congress also worried that intermediary liability could
have the opposite effect:  discouraging service providers from
undertaking voluntary measures to screen content with the fear of
lawsuits accusing them of carrying out those efforts negligently.
<u>Id.</u> at 420.

cannot call the defendants to answer for that under state law.
See, e.g., Carafano, 339 F.3d at 1122-24 (dismissing complaint
against on-line dating service for unknown party's posting of
unauthorized and defamatory profile of plaintiff); Zeran, 129
F.3d at 328 (affirming dismissal of complaint against service
provider for defamatory statements posted by others); Blumenthal
v. Drudge, 992 F. Supp. 44, 50 (D.D.C. 1998) (dismissing claim
against service provider for disseminating another's statements).

The Universal opinion makes clear that the bar on publisher
liability also extends to the plaintiff's charges that certain
features of the AdultFriendFinder service facilitated the
submission of false or unauthorized profiles.  The plaintiff in
Universal argued that the postings on the defendant service
provider's message boards did not qualify as "information
provided by another" under § 230(f)(3) because the provider had
"rendered culpable assistance" in creating the postings "through
the construct and operation of its web site," including a feature
that allowed a single individual to post under multiple screen
names.  478 F.3d at 420.  In rejecting this argument, the Court
of Appeals called this feature "standard" for such sites,
reasoning that imposing liability on that basis here would
"eviscerate Section 230 immunity."  Id.  Under Universal, then,

10

§ 230 bars the plaintiff's claims that the defendants acted wrongfully by encouraging the anonymous submission of profiles or by failing to verify that a profile corresponded to the submitter's true identity.[5]  The plaintiff offers no argument to the contrary.

The same is true of the plaintiff's claim that the defendants contributed to the lascivious nature of the profile by allowing the user to select from a pre-set menu of "sexual responses" in creating it.  The <u>Universal</u> court relied on the Ninth Circuit's decision in <u>Carafano</u> that an Internet dating service did not forfeit its § 230 immunity by providing a questionnaire that one of its users had completed with false information about the plaintiff to create an unauthorized and defamatory profile.  478 F.3d at 420 (citing <u>Carafano</u>, 339 F.3d at 1124-25).  The <u>Carafano</u> court rejected the argument that furnishing the questionnaire--or, for that matter, organizing users' responses into profiles as part of the site's sophisticated searching and matching functions--amounted to the "creation or development of information" under § 230(f)(3) necessary to transform the service provider into an "information

---

[5]  Indeed, the <u>Universal</u> court ruled that the defendant there did not exceed its privileges as a service provider even through its practice of taking legal action to protect the anonymity of its subscribers.  478 F.3d at 421.

11

content provider" unprotected by the CDA.[6]  339 F.3d at 1124-25.
Despite these practices, the Ninth Circuit reasoned, "'the
underlying misinformation' that formed the basis for the
complaint was contained entirely in the responses provided by the
user," rather than originating with the defendant itself.
Universal, 478 F.3d at 420 (quoting Carafano, 339 F.3d at 1125).

This reasoning, adopted by the First Circuit in Universal,
is also fatal to the plaintiff's claim arising from the
defendants' alleged "first-party statements" in posting the
profile on websites besides AdultFriendFinder, whether as such or
in the form of "teasers" or other advertisements.  Section 230
immunity depends on the source of the information in the
allegedly tortious statement, not on the source of the statement
itself.  Because "petra03755" was the source of the allegedly
injurious matter in the profile, then, the defendants cannot be
held liable for "re-posting" the profile elsewhere without
impermissibly treating them as "the publisher or speaker of []
information provided by another information content provider."[7]

---

[6]  Like the questionnaire alleged here, the questionnaire at
issue in Carafano offered a "menu of 'pre-prepared responses'" to
a variety of "detailed questions."  339 F.3d at 1125.

[7]  That the defendants allegedly learned that the profile
was false and unauthorized before re-posting it does not bring
their conduct outside the protections of the Act.  As the First
Circuit held in Universal, "[i]t is, by now, well established

47 U.S.C. § 230(c)(1).  The CDA shields the defendants from precisely that kind of liability.  See Chicago Lawyers' Comm., 2008 WL 681168, at *4 ("What § 230(a)(1) says is that an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else."); accord Universal, 478 F.3d at 422 (rejecting claim that "would depend on treating [provider] as the publisher of [another's] postings").

Furthermore, as the First Circuit also held in Universal, a service provider's privilege as a "publisher" under the Act protects more than the mere repetition of data obtained from another source, but extends to the provider's "inherent decisions about how to treat postings generally."  478 F.3d at 422.  So the plaintiff cannot escape the bar of § 230 through her claims that the defendants wrongfully identified the profile as "hers" when they removed it from the AdultFriendFinder site, or that they falsely stated that "this member" was the one who had removed it. The allegedly tortious nature of those statements proceeds solely from the association they create between the plaintiff and the content of the profile.  Again, that content did not originate

---

that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech" under § 230.  478 F.3d at 420 (citing Zeran, 129 F.3d at 332-33).  The plaintiff does not argue to the contrary.

13

with the defendants, but with an unknown third party.[8]  Like the
defendant in Carafano, the defendants here were "not responsible,
even in part, for associating certain . . . responses with a set
of physical characteristics, a group of . . . answers, and a
photograph," and so "cannot be considered an 'information content
provider' under the statute because no profile has any content
until a user actively creates it."  339 F.3d at 1124; see also
Gentry v. eBay, Inc., 121 Cal. Rptr. 2d 703, 717-18 (Cal. Ct.
App. 2002) (ruling that § 230 barred claims arising from on-line
auction site's endorsements of certain sellers where site
automatically generated endorsements based on data from users).

_____

     [8]  To the extent that the plaintiff claims that the
defendants injured her merely by identifying her--or, more
accurately, a person reasonably believed to be her--as a member
of their services, that information likewise originated with the
third party who filled in the profile with biographical
information corresponding to the plaintiff's and therefore cannot
serve as the basis of a claim unscathed by § 230.  Moreover, the
plaintiff does not claim that the defendants' statements
identifying the user who created the profile as such "are
anything but standard for message boards and other web sites."
Universal, 478 F.3d at 420.  As noted supra, the First Circuit
has held that premising liability on the standard features that
service providers use in identifying and organizing data from
other sources would effectively gut the protections of the Act.
Id.; see also Global Royalties, Ltd. v. Xcentric Ventures, LLC,
No. CV-07-0956, 2008 WL 565102, at *3 (D. Ariz. Feb. 28, 2008)
(reading § 230 to bar claim that service provider failed to
remove defamatory statement despite its author's request because,
otherwise, "any time anyone purporting to be the author of a
particular content requested retraction, website operators would
still have an incentive to simply remove the speech," in
contravention of § 230's purposes).

A service provider's immunity as a publisher also extends to its "exercise of a publisher's traditional editorial functions" with respect to third-party information, "such as deciding whether to publish, withdraw, postpone or alter" it.  Zeran, 129 F.3d at 330; accord Universal, 478 F.3d at 422 (ruling that § 230 shielded service provider's "editorial decision" as to defamatory third-party posting).  A number of courts have reasoned that construing the CDA more narrowly would frustrate what they see as one its primary objectives by discouraging service providers from voluntarily regulating third-party contributions to their websites.  See Batzel v. Smith, 333 F.3d 1018, 1031 (9th Cir. 2003); Ben Ezra, Weinstein, & Co., 206 F.3d at 985-86; Zeran, 129 F.3d at 330; Blumenthal, 992 F. Supp. at 51-52.  Rather than risking lawsuits over allegedly failed efforts toward that end, these courts have reasoned, service providers would simply disallow--or allow--all third-party speech regardless of content, transforming the Internet into a highly sterile--or highly polluted--medium, in contravention of the policies the Act was explicitly intended to further.  See also 47 U.S.C. § 230(b).

Under the CDA, then, the plaintiff cannot recover from the defendants for re-posting the profile with what she describes as "slight" modifications, as other courts have ruled in rejecting similar claims.  See Batzel, 333 F.3d at 1031 (holding that

15

service provider's "minor alterations" to defamatory material
from another source do not "rise to the level of 'development'"
necessary for liability under § 230(f)(3)); Ben Ezra, Weinstein,
& Co., 206 F.3d at 985-86 (rejecting argument that service
provider's deletion of some, but not all, inaccurate data about
plaintiff from another source "transforms Defendant into an
'information content provider'"); Blumenthal, 992 F. Supp. at 52
(ruling that service provider's exercise of "editorial control"
over defamatory third-party content fell within § 230 immunity).

As the plaintiff points out, the Act offers no protection to
a service provider for publishing tortious content created by the
provider itself.  See Anthony v. Yahoo! Inc., 421 F. Supp. 2d
1257, 1262-1263 (N.D. Cal. 2006) (ruling that § 230 did not bar
misrepresentation claims arising out of dating service's alleged
creation of false profiles which induced plaintiff to maintain
his membership there); Hy Cite Corp. v. badbusinessbureau.com,
L.L.C., 418 F. Supp. 2d 1142, 1149 (D. Ariz. 2005) (ruling that §
230 did not bar claims premised on service provider's creation of
its own comments and other defamatory content to accompany third-
party postings on its website).[9]  But, as the foregoing

_____

[9]  The court acknowledges that certain aspects of these
rulings suggest an even narrower view of § 230 immunity, but
declines to follow them because they contradict the First
Circuit's Universal decision.  In Anthony, the court ruled that

16

discussion makes clear, a service provider's exercise of its

editorial prerogatives as to information from another content

provider does not transform the service provider into the content

provider under § 230.  While, in some cases, whether the service

provider has exceeded its editorial privileges may present a

close question, <u>see</u>, <u>e.g.</u>, <u>Hy Cite</u>, 418 F. Supp. 2d at 1149, the

plaintiff herself characterizes the defendants' modifications to

the profile as "slight," and does not allege that they

---

the immunity did not extend to an on-line dating service's
circulating "profiles of actual, legitimate former subscribers
whose subscriptions had expired, thus giving the misleading
impression that these individuals are still available for dates."
421 F. Supp. 2d at 1260 (internal quotation marks omitted).
Though recognizing that "third parties created these profiles,"
the court reasoned that "[b]ecause [the plaintiff] posits that
[the defendant's] manner of presenting the profiles––not the
underlying profiles themselves––constitute [*sic*] fraud, the [Act]
does not apply."  <u>Id.</u> at 1263.  Insofar as this reasoning
suggests that a service provider can be held liable despite the
CDA simply for "presenting" data from another information content
provider, it is inconsistent with <u>Universal</u>, as discussed <u>supra</u>.

     In <u>Hy Cite</u>, the court ruled that the defendants' generalized
solicitation of reports for their website from third parties
"could support a finding that Defendants are responsible for the
creation or development" of the data in the reports.  418 F.
Supp. 2d at 1149 (internal quotation marks and ellipse omitted).
But in <u>Universal</u>, the court of appeals expressed doubt about "a
culpable assistance exception to Section 230 immunity," and held
that, even if such an exception existed, it would require the
defendant to engage in "clear expression or other affirmative
steps taken to foster unlawful activity."  478 F.3d at 421
(internal quotation marks omitted).  The practice alleged in <u>Hy
Cite</u> would not seem to meet that standard.  In any event, the
plaintiff here has not alleged anything even approaching it.

contributed to its injurious character.[10]  Because the plaintiff

seeks to hold the defendants liable as the publisher or speaker

of information provided by another content provider, her state-

law claims set forth in Counts II-VI and VIII are barred by the

CDA.  <u>See</u> 47 U.S.C. §§ 230(c)(1), (e)(3).


**B.   <u>The invasion of privacy claim</u>**

The CDA provides that "[n]othing in this section shall be

construed to limit or expand any law pertaining to intellectual

property."  47 U.S.C. § 230(e)(2).  Relying on this provision,

the plaintiff argues that the CDA does not affect her state-law

claims for invasion of privacy, which she characterizes as an

---

[10]   Again, the only modification the plaintiff has identified
is a minimal change in "petra03755"'s age, <u>see</u> note 2, <u>supra</u>.  At
oral argument, the plaintiff characterized this as a "very minor
edit," but argued that it nevertheless showed that the defendants
had "consciously" decided whether to re-post the profile, thus
transforming the re-postings into their own statements for
purposes of § 230.  Claiming that the re-postings had been
automatically generated, the defendants disputed this point, but
it is irrelevant to the question of § 230 immunity anyway.  As
just discussed, that immunity depends on the source of the
information in the injurious statement, not the source of the
statement itself, <u>see</u>, <u>e.g.</u>, <u>Universal</u>, 478 F.3d at 420, and the
source of that information was the creator of the profile,
despite the "minor edits" to it allegedly made by the defendants,
<u>see</u>, <u>e.g.</u>, <u>Batzel</u>, 333 F.3d at 1031.  In light of this reality,
the CDA does not allow liability against the defendants on the
theory that they adopted the third party's statements by
consciously--or unconsciously--deciding to re-post them on other
sites.  <u>See</u>, <u>e.g.</u>, <u>Chicago Lawyers' Comm.</u>, 2008 WL 681168, at *4.

infringement of her intellectual property rights.  The defendants

respond that § 230(e)(2) does not apply to intellectual property

rights granted under state--as opposed to federal--law.

In Universal, however, the court of appeals stated, in

reference to a claim under Florida's trademark dilution statute,

that "[c]laims based on intellectual property laws are not

subject to Section 230 immunity."  478 F.3d at 422-23.  The

defendants characterize this pronouncement as non-binding dicta,

noting that the court ultimately decided that the plaintiff had

not pled a claim for relief under the Florida statute.[11]  Id. at

---

[11]  At oral argument, the defendants sought to characterize
this disposition as reflecting the Universal court's "concern"
over the use of state-law intellectual property claims to
circumvent CDA immunity.  That is inaccurate and, in any event,
irrelevant in light of the court's contrary dicta.  While the
district court in Universal had ruled that the "trademark claim
was effectively a defamation claim in the guise of an
antidilution claim" and therefore within the scope of CDA
immunity, the court of appeals chose to "reason somewhat
differently, holding that even though Section 230 immunity does
not apply, the claim was properly dismissed as a matter of
trademark law."  478 F.3d at 423 n.7 (internal quotation marks
and ellipse omitted).  That holding was based on the conclusion
that the plaintiff's theory of trademark liability--that its
trade name had been diluted when the defendant service providers
allowed messages which criticized the plaintiff's business by
that name to appear on their message boards--"would raise serious
First Amendment concerns."  Id. at 423.  To avoid these concerns,
the court of appeals construed the Florida anti-dilution statute
to exclude conduct "simply referring to [a] company [by its]
trade name."  Id. at 425.  That it ultimately dismissed, on
grounds unrelated to the CDA, a particular state-law intellectual
property claim which survived CDA immunity cannot support the
inference that it would read the CDA to bar all such claims if

425.  Because the court of appeals would have upheld the
dismissal of the plaintiff's state-law claim regardless of its
interpretation of 47 U.S.C. § 230(2), its statement in that
regard arguably fits the usual definition of dicta, <u>i.e.</u>,
observations in a court's opinion which are not essential to the
outcome of the case before it.  <u>See</u>, <u>e.g.</u>, <u>Arcam Pharm. Corp. v.
Faria</u>, 513 F.3d 1 (1st Cir. 2007).

Nevertheless, just as the First Circuit accords considerable
deference to dicta in Supreme Court opinions, <u>see</u>, <u>e.g.</u>, <u>SEC v.
Rocklage</u>, 470 F.3d 1, 7 n. 3 (1st Cir. 2006), this court "accords
substantial deference to the considered dicta of the court of
appeals."  <u>Buchanan v. Westinghouse Elec. Corp.</u>, No. 90-370, 1993
WL 836970, at *1 (D.N.H. Aug. 17, 1993); <u>accord</u> <u>Patsy's Italian
Rest., Inc. v. Banas</u>, 508 F. Supp. 2d 194, 211 (E.D.N.Y. 2007);
<u>Guyon v. Basso</u>, 403 F. Supp. 2d 502, 509 (E.D. Va. 2005); <u>Max M.
v. Thompson</u>, 585 F. Supp. 317, 324 (N.D. Ill. 1984).  This court
will follow First Circuit dicta over the contrary holding of
another appeals court, then, absent a particularly compelling
reason to do otherwise.

---

squarely presented with the issue.  This conclusion is confirmed
by the <u>Universal</u> court's statement, albeit in dicta, that such
claims "are not subject to Section 230 immunity."  <u>Id.</u> at 422-23.

There is no reason to disregard the dicta from <u>Universal</u>
here.  As an initial matter, other courts have joined the First
Circuit in assuming, at least, that § 230(e)(2) excepts state as
well as federal intellectual property laws from the scope of the
Act's immunity provision.  <u>See</u> <u>Almeida v. Amazon.com, Inc.</u>, 456
F.3d 1316, 1324 (11th Cir. 2006); <u>Gucci Am., Inc. v. Hall &</u>
<u>Assocs.</u>, 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001).  In support of
their more restrictive reading, the defendants rely on the Ninth
Circuit's decision in <u>Perfect 10, Inc. v. CC Bill, LLC</u>, 488 F.3d
1102 (9th Cir.), <u>cert. denied</u>, 128 S. Ct. 709 (2007).  There,
noting the absence of "an express definition of 'intellectual
property'" in the Act itself, the Ninth Circuit "construe[d] the
term 'intellectual property' to mean 'federal intellectual
property.'"  <u>Id.</u> at 1118-19 (footnote omitted).  Even putting the
contrary First Circuit dictum from <u>Universal</u> aside, this court
does not find the Ninth Circuit's resolution of the statutory
interpretation question to be persuasive.

"Statutory interpretation begins with the language of the
statute.  Where . . . that language is clear and unambiguous, the
inquiry is at an end."  <u>Ruiz v. Bally Total Fitness Holding</u>
<u>Corp.</u>, 496 F.3d 1, 8 (1st Cir. 2007) (citing <u>United States v. Ron</u>
<u>Pair Enters.</u>, 489 U.S. 235, 241 (1989)).  Here, the language of

§ 230(e)(2) itself does not suggest a limitation to federal
intellectual property law, but states simply that "[n]othing in
this section shall be construed to limit or expand <u>any</u> law
relating to intellectual property" (emphasis added).  As the
Supreme Court has noted in another context, the modifier "any"
amounts to "expansive language [that] offers no indication
whatever that Congress intended [a] limiting construction."
<u>Harrison v. PPG Indus.</u>, 446 U.S. 578, 589 (1980) (reading phrase
"any other final action" in Clean Air Act, 42 U.S.C. §
7607(b)(1), "to mean exactly what it says, namely, <u>any other</u>
final action"); <u>see also</u> <u>Ali v. Fed. Bureau of Prisons</u>, 128 S.
Ct. 831, 835-37 (2008) (reasoning that phrase "<u>any</u> other law
enforcement officer" in Federal Tort Claims Act, 28 U.S.C. §
2680(c), "suggests a broad meaning").  The Ninth Circuit made no
attempt to reckon with the presence of the term "any"--or for
that matter, the absence of term "federal"--in § 230(e)(2) when
limiting it to federal intellectual property laws.

Nor did the Ninth Circuit make any effort to reconcile its
reading of § 230(2) with other limiting provisions of § 230 which
specifically identify federal or state law as such.  <u>See</u> 47
U.S.C. §§ 230(e)(1) ("Nothing in this section shall be construed
to impair the enforcement of [named federal criminal statutes] or
any other <u>Federal</u> criminal statute"), (e)(3) ("Nothing in this

section shall be construed to prevent any State from enforcing any <u>State</u> law that is consistent with this section") (emphases added).  The content of these provisions indicates that, where Congress wished to distinguish between state and federal law in § 230, it knew how to do so.  <u>See</u> <u>Voicenet Comms., Inc. v. Corbett</u>, No. 04-1318, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30, 2006).

In ruling that § 230(e)(1)'s removal of "any other Federal criminal statute" from the scope of the Act did not extend to state criminal law, the <u>Voicenet</u> court reasoned that "[i]f Congress had wanted all criminal statutes to trump the CDA, it could have written [§ 230(e)(1)] to cover 'any criminal statute'" just as it had written § 230(e)(2) to cover "any law pertaining to intellectual property." <u>Id.</u>  Conversely, the use of "any" in § 230(e)(2), in contrast to the use of "federal" elsewhere in the CDA, suggests that Congress did not intend the terms to be read interchangeably.  "It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Duncan v. Walker</u>, 533 U.S. 167, 173 (2001) (internal quotation marks and bracketing omitted) (declining to read "federal" into section of statute where it did not appear because Congress had "denominat[ed] expressly both

23

'State' and 'Federal' . . . in other parts of the same statute");
accord <u>United States v. Councilman</u>, 418 F.3d 67, 74 (1st Cir.
2005) (calling this rule "simply a particular application of the
classic principle *expressio unius est exclusio alterius*").

Rather than tying its limiting construction of § 230(2) to
the language of the CDA, the Ninth Circuit purported to draw on
what it viewed as the purposes of the CDA's immunity provision,
reasoning:

> While the scope of federal intellectual property
> law is relatively well-established, state laws
> protecting 'intellectual property,' however
> defined, are by no means uniform . . . . Because
> material on a website may be viewed across the
> Internet, and thus in more than one state at a
> time, permitting the reach of any particular
> state's definition of intellectual property to
> dictate the contours of this federal immunity
> would be contrary to Congress's expressed goal of
> insulating the development of the Internet from
> the various state-law regimes.

<u>Perfect 10</u>, 488 F.3d at 1118 (citing 47 U.S.C. §§ 230(a), (b)).
However salutary this "goal" might be on its own merits, it is
not among those "expressed" in § 230.  While the text of § 230
identifies one of its purposes as freeing the Internet from
"government regulation," 47 U.S.C. § 230(a)(4), this plain
language restricts regulation by <u>any</u> government, not just those
of the states.  One of § 230's announced policies, in fact, is
"to preserve the vibrant and competitive free market that

presently exists for the Internet and other interactive computer services, unfettered by <u>Federal or State</u> regulation."  <u>Id.</u> § 230(b)(2) (emphasis added); <u>see also</u> <u>Zeran</u>, 129 F.3d at 330 ("Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep <u>government</u> interference in the medium to a minimum.") (emphasis added).  As the presence of § 230(e)(2) indicates, however, Congress also believed that laws protecting intellectual property rights should nevertheless remain in effect--that the potential costs to those rights, in essence, outweighed the benefits of the alternative.

The <u>Perfect 10</u> court did not identify any other support for its view that the CDA was passed out of a concern for the threat that diverse state laws might have on the development of the Internet.  Thus, while Congress often acts to protect interstate commerce from the burden of nonuniform state laws, there is nothing in the language of § 230 effecting that protection here.  "Courts are not free to disregard the plain language of a statute and, instead, conjure up legislative purposes and intent out of thin air" under the guise of statutory interpretation.  <u>Ruiz</u>, 496 F.3d at 8 (footnote omitted).

Aside from its inconsistency with the statutory language, <u>Perfect 10</u>'s reasoning has an additional weakness ignored in the opinion and not convincingly addressed by the defendants here:

its assumption that the intellectual property laws of the several states so differ from each other, and from their federal counterpart, that complying with the state laws would burden service providers in a way or to a degree that complying with the federal law would not.  The assumption appears shaky at best. "In general, federal and state trademark and unfair competition law can coexist and cooperate without conflict," 3 Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 22:2, at 22-8 (4th ed. 1992), because "[i]n most states, the state statutes are given the same meaning and interpretation as the mainstream principles of common law and federal common law," id. § 22:1, at 22-7 (footnote omitted).  This is the case in New Hampshire, where courts have regularly looked to federal trademark law in developing state standards.  See, e.g., Optical Alignment Sys. & Inspection Servs. v. Alignment Servs. of N. Am., 909 F. Supp. 58, 61-62 (D.N.H. 1995); Auto Body Specialists, Inc. v. Vallee, 127 N.H. 382, 384 (1985).

To be sure, state intellectual property law can differ from federal in particular respects.  See, e.g., Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 40-41 (1st Cir. 2006) (giving effect to New Hampshire law allowing for attorneys' fees in infringement action as a matter of course, despite higher standard imposed by federal law).  But neither the Ninth Circuit nor the defendants

26

here offer a single example of how "any particular state's definition of intellectual property," <u>Perfect 10</u>, 488 F.3d at 1118, meaningfully enlarges its protections beyond those conferred by federal law, or how intellectual property regimes "vary widely from state to state" in substance, <u>id.</u> at 1119 n.5. This court has no reason to believe that reading § 230(e)(2) to exempt state intellectual property law would place any materially greater burden on service providers than they face by having to comply with federal intellectual property law--an obligation that persists under even <u>Perfect 10</u>'s construction of the CDA.[12]  That court's view that "inclusion of rights protected by state law within the 'intellectual property' exemption would fatally undermine the broad grant of immunity provided by the CDA," 488 F.3d at 1119 n.7, is simply unsupported.

Thus, even if it were free to disregard the plain language of § 230(e)(2), this court cannot accept the defendants' claim at oral argument that allowing state-law intellectual property claims to survive the CDA would have a "devastating" impact on the internet.  Despite the general consensus before the <u>Perfect 10</u> decision that the CDA did <u>not</u> shield service providers from

---

[12]   Indeed, the present case serves as an effective counterexample since, as discussed <u>infra</u>, the plaintiff's state right of publicity claim and federal Lanham Act claim almost entirely overlap.

state intellectual property law, both the internet and so-called "e-commerce" remain alive and well, and show no signs of imminent collapse.  See Laurin H. Mills & Leslie Paul Machado, "ISP Immunity Provision Is Broadly Interpreted:  But One Exception Exists When a Violation of Trademark Law Is Alleged," Nat'l L.J., April 15, 2002, at C19.  Indeed, while protecting third-party intellectual property rights no doubt presents some challenges for service providers like the defendants, those challenges would appear to be simply a cost of doing business on-line.  They certainly cannot support judicially rewriting the CDA, in any event.

Accordingly, and in line with the First Circuit's dictum in Universal, this court disagrees with the Ninth Circuit's decision in Perfect 10 that § 230(e)(2) exempts only federal intellectual property laws from the operation of § 230.  Consistent with its text, § 230(e)(2) applies simply to "any law pertaining to intellectual property," not just federal law.  See Gucci, 135 F. Supp. 2d at 413; see also Mills & Machado, supra (calling Gucci "correctly decided" in light of "express statutory language" which "specifically carved out intellectual property claims").[13]

_____

[13]  Predicting that this reading will "inspire some strained trademark claims as creative plaintiffs' attorneys attempt to circumvent the § 230 immunities," this article proposes its own creative response:  an argument that § 230(e)(2) does not apply

28

The court must now consider whether, aside from its origin
in state law, Count I of the plaintiff's complaint arise from a
"law pertaining to intellectual property" under the CDA.[14] This
count, entitled "Invasion of Privacy/Intellectual Property
Rights," asserts four separate theories against the defendants:
(1) that they have intruded on her solitude, (2) that they have
publicly disclosed private facts about her, (3) that they have
given her publicity so as to place her in a false light, and (4)
that they have appropriated her identity for their own benefit or
advantage.  These theories correspond to the four privacy torts
acknowledged by the New Hampshire Supreme Court in Hamberger v.
Eastman, 106 N.H. 107, 110 (1964) (quoting William L. Prosser,
Prosser on Torts § 112, at 832 (3d ed. 1964)), and later adopted
in the Restatement (Second) of Torts §§ 652A-E (1977).  See J.
Thomas McCarthy, The Rights of Publicity and Privacy § 1:24 (2d
ed. 2000) (hereinafter "McCarthy, Rights of Publicity").

While the plaintiff objects to the dismissal of any part of
Count I on the ground that it asserts "intellectual property

---

to trademark claims at all because they "are not 'intellectual
property' claims."  This proposition strikes the court as
dubious, see infra, but, in any event, it need not be considered
here because the defendants have not advanced it.

[14]  The plaintiff also does not argue that § 230(e)(2)
exempts any of her state-law claims aside from those asserted in
Count I.

rights" under § 230(e)(2), her argument and authorities on that score address only the fourth theory, commonly known as a "right of publicity" claim.  <u>See</u>, <u>e.g.</u>, <u>Carson v. Here's Johnny Portable Toilets, Inc.</u>, 698 F.2d 831, 834 (6th Cir. 1983).  As the plaintiff points out, "the right of publicity is a widely recognized intellectual property right."  <u>Almeida</u>, 456 F.3d at 1322 (citing authorities).  Such a claim therefore arises out of a "law pertaining to intellectual property" within the meaning of the statute.  <u>See</u> 1 McCarthy, <u>Rights of Publicity</u>, § 3:42 (opining that § 230 immunity does not apply to claim for infringement of right to publicity by virtue of § 230(e)(2)).

The other three torts encompassed by the "right of privacy" rubric, however, do not fit that description.  Unlike a violation of the right to publicity, these causes of action--intrusion upon seclusion, publication of private facts, and casting in false light--protect "a personal right, peculiar to the individual whose privacy is invaded" which cannot be transferred like other property interests.  <u>Restatement (Second of Torts)</u> § 625I & cmt. <u>a</u>; <u>see also</u> <u>Lambert v. Garlo</u>, 484 N.E.2d 260, 263 (Ohio Ct. App. 1985) ("The right of privacy is not a property right, but rather an incident personal in its nature.") (internal quotation marks and ellipse omitted); 1 McCarthy, <u>Rights of Publicity</u>, §§ 10:3-10:5; <u>accord</u> <u>Herman Miller, Inc. v. Palazzetti Imports & Exports,</u>

Inc., 270 F.3d 298, 325 (6th Cir. 2001).  The plaintiffs' claims

under these branches of the privacy doctrine, then, do not sound

in "law pertaining to intellectual property," and she offers no

authority or argument to the contrary.  While § 230(e)(2) exempts

her right of publicity claim from the immunity provision of the

CDA, then, that provision applies with full force to the other

invasion of privacy claims asserted in her complaint.[15]  See 1

McCarthy, Rights of Publicity, § 3:42.

The defendants also argue that, in any event, the plaintiff

has not stated a claim for violation of her right to publicity.[16]

New Hampshire recognizes a cause of action for infringement of

the right to publicity as set forth in the Restatement (Second)

of Torts.  Remsberg v. Docusearch, Inc., 149 N.H. 148, 157

---

[15]  The plaintiff also does not argue that § 230 immunity
does not otherwise extend to these invasion of privacy claims,
which would, like the other state-law causes of action in her
complaint, appear to depend on treating the defendants as the
publisher or speaker of tortious matter supplied by a third
party.  See Carafano, 339 F.3d at 1122-1124 (ruling that § 230
barred invasion of privacy claims against service provider
without discussing application of § 230(e)(2)).

[16]  The defendants did not raise this argument until their
reply memorandum.  Ordinarily, this court does not consider
theories advanced for the first time in reply.  See, e.g., M & D
Cycles, Inc. v. Am. Honda Motor Co., 208 F. Supp. 2d 115, 122
(D.N.H. 2002); L.R. 7.1(e)(1) (restricting reply "to rebuttal of
factual and legal arguments raised in the objection").  While the
court will nevertheless consider the defendants' argument here,
counsel are reminded that all theories of relief, even
alternative ones, should be raised in the opening brief.

(2003).  Under this rule, "'[o]ne who appropriates to his own use

or benefit the name or likeness of another is subject to

liability to the other for invasion of his privacy.'"  <u>Id.</u>

(quoting <u>Restatement (Second) of Torts</u> § 652C (1977)).  "'The

interest protected by the rule . . . is the interest of the

individual in the exclusive use of his own identity, in so far as

it is represented by his name or likeness, and in so far as the

use may be of benefit to him or to others.'"[17]  <u>Id.</u> (quoting

<u>Restatement (Second) of Torts</u> § 652C, cmt. <i>a</i>).

    Because the right of publicity thus safeguards the

beneficial use of a plaintiff's identity, the defendants argue,

the plaintiff cannot succeed on this theory unless she pleads

_____

[17]   The <u>Remsberg</u> court ultimately concluded that the
defendant's conduct in providing a third party with biographical
data about the decedent--most notably her place of employment,
which enabled the third-party to shoot and kill the decedent as
she left work--was not actionable as a violation of her right to
publicity, because "[a]n investigator who sells personal
information sells [it] for the value of the information itself,
not to take advantage of the person's reputation or prestige."
149 N.H. at 158.  For the first time at oral argument, the
defendants sought to liken themselves to the defendant in
<u>Remsberg</u>, insisting that the challenged materials contained "mere
information" about the plaintiff.  The plaintiff alleges,
however, that the defendants did "take advantage of [her]
reputation and prestige"--at least as they were falsely
represented in the profile--by using the profile to advertise
their site.  Unlike the defendants in <u>Remsberg</u>, then, the
defendants here did more than simply make personal information
about the plaintiff available for a price.  The defendants'
<u>Remsberg</u> argument is untimely and unpersuasive.

that her identity has lost commercial value as a result of the defendants' use of it.  They provide no authority, however, that supports their strict view of the pleading requirements for such a claim.  As the defendants note, the treatise they cite lists the elements of "a prima facie case for liability of infringement of the right to publicity" as:

> (1) *Validity*.  Plaintiff owns an enforceable right in the identity or persona of a human being; and
>
> (2) *Infringement*.
>     (A)  Defendant, without permission, has used some aspect of identity or persona in such a way that plaintiff is identifiable from defendant's use; and
>     (B)  Defendant's use is likely to cause damage to the commercial value of that persona.

1 McCarthy, <u>Rights of Publicity</u>, § 3:2 (footnotes omitted).  The treatise also explains, however--just two sentences later--that "evidence of some quantifiable commercial damage" is not "an essential element of proof of liability for infringement of the right of publicity."  <u>Id.</u>  Instead, "[s]ome damage to the commercial value of an identity is presumed once it is proved that defendant has made an unpermitted use of some identifiable aspect of identity in such a commercial context that one can state that such damage is likely," though "commercial damage ultimately must be proved and quantified" if the plaintiff seeks to recover for it.  <u>Id.</u>

Contrary to the defendants' argument, then, the allegations
of the plaintiff's complaint align with the elements of a claim
for violation of her right of publicity as set forth in the
McCarthy treatise.[18]  The plaintiff alleges that the defendants
made an unauthorized use of identifiable aspects of her persona
in the form of the profile itself and the portions of it that
appeared as advertisements and "teasers" on other websites and,
furthermore, that the defendants did so in an effort to increase
the profitability of their businesses.  These allegations suffice
to state a claim for infringement of the plaintiff's right to
publicity.  See Villalovos v. Sundance Assocs., Inc., No. 01-
8468, 2003 WL 115243, at *4 (N.D. Ill. Jan. 13, 2003) (denying
motion to dismiss right of publicity claim arising out of
unauthorized use of non-celebrity plaintiff's first name and
address in personal advertisement seeking sexual partners despite
defendant's argument that use did not injure value of plaintiff's
identity).  The damages available to the plaintiff, if and when
she proves these allegations, present an issue for a later stage

---

[18]  Because the defendants rely solely on the McCarthy
treatise for the elements of a right of publicity claim, and
because the defendants did not advance this argument until their
reply memorandum, the court will assume for purposes of this
motion that McCarthy's view comports with New Hampshire law,
reserving a final decision on this issue for later in the
proceedings if necessary.

34

of the proceedings.  See 1 McCarthy, Rights of Publicity, § 3:2.
The motion to dismiss the right of publicity claim is denied.[19]


### III. **The Lanham Act claim**

Count VII of the plaintiff's complaint asserts "False
Designations" in violation of the Lanham Act, 15 U.S.C. §§ 1051
et seq.  As the plaintiff points out, her allegations in support
of this count essentially track the language of § 43(a)(1) of the
Lanham Act, which provides that:

> Any person who, on or in connection with any goods or
> services . . ., uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading
> description of fact, or false or misleading
> representation of fact, which--
>
> > (A) is likely to cause confusion, or cause
> > mistake, or to deceive as to the affiliation,
> > connection, or association of such person with
> > another person, or as to the origin, sponsorship,

---

[19]  At oral argument, the defendants hinted at other
challenges to the plaintiff's right of publicity claim on grounds
asserted in neither their opening nor reply memorandum, including
that they had made merely an "incidental use" of her persona and
that holding them liable for such a claim would violate the
dormant Commerce Clause doctrine.  As has been noted, see notes
16-17, supra, arguments omitted from a party's opening
memorandum--let alone its reply memorandum--are ordinarily not
considered, out of fairness to adverse parties and the court.
Though the court has been willing to show some solicitude in
taking up the defendants' untimely arguments, that leeway cannot
extend to entirely new theories raised for the first time at oral
argument, and even then only fleetingly.  These additional
arguments will therefore not be considered here.

or approval of her goods, services, or commercial
activities by another person, or

(B) in commercial advertising or promotion,
misrepresents the nature, characteristics,
qualities, or geographic origin of his or her or
another person's goods, services, or commercial
activities,

shall be liable in a civil action by any such person
who believes that he or is she is likely to be damaged
by such act.

15 U.S.C. § 1125(a)(1).  As the plaintiff makes clear in her

objection to the motion to dismiss, her complaint presses claims

for both false designation under subsection (A) and false

advertising under subsection (B).

In support of their motion to dismiss, the defendants

principally argue that the plaintiff has not pled the elements of

a false advertising claim under the Lanham Act.  The elements of

such a claim are:

(1)   the defendant made a false or misleading
representation of fact in a commercial
advertisement about his own or another's product
or service;

(2)   the misrepresentation is material;

(3)   the misrepresentation deceives, or has the
tendency to deceive, a substantial segment of its
audience;

(4)   the defendant placed the misrepresentation in
interstate commerce; and

(5)   "the plaintiff has been or is likely to be injured
as a result of the misrepresentation, either by

36

> direct diversion of sales or by a lessening of
> goodwill associated with its products" or service.

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d
302, 310-11 (1st Cir. 2002).

The plaintiff has alleged each of these elements in her complaint.  She claims that the defendants, through the use of the profile in "teasers" and other advertisements placed on the Internet, falsely represented that she was a participant in their on-line dating services; that these misrepresentations deceived consumers into registering for the defendants' services in the hope of interacting with the plaintiff; and that she suffered injury to her reputation as a result--including, she believes, opportunities at employment.  The plaintiff has therefore stated a false advertising claim under the Lanham Act.  See Benson v. Paul Winley Record Sales Corp., 452 F. Supp. 516, 517-18 (S.D.N.Y. 1978) (granting relief to musician on false advertising theory based on defendant's misrepresentation of album, which featured "sexually suggestive moaning of woman," to be his work, because consumers would "associate [musician] with the blatant sexual appeal of the . . . album and mistakenly believe that [he] endorses 'X Rated' material," causing "irreparable injury to [his] professional and personal reputation").

Indeed, as McCarthy explains, "many instances of the unpermitted use of a person's identity will make a misleading and false inference of endorsement, approval or sponsorship and hence trigger false advertising concerns in addition to infringing upon the right of publicity.  In such cases, plaintiff will have valid allegations of both false advertising and infringement of the right to publicity."  1 McCarthy, Rights of Publicity, § 5:19. That is the case here, where plaintiff alleges that the defendants made unauthorized use of her identity in marketing their websites, creating the false--and, from her perspective, harmful--impression that she was affiliated with them.  She has therefore stated claims for both infringement of her common-law right to publicity and false advertising under the Lanham Act.

The plaintiff has likewise stated a claim for false designation under § 43(a) of the Lanham Act.  In relevant part, this subsection prevents a defendant from using the plaintiff's name in commerce in connection with services in a way likely to cause confusion as to "the affiliation, connection, or association" of the parties or the plaintiff's "sponsorship or approval" of the defendant's "services, or commercial activities."  15 U.S.C. § 1125(a)(1)(A).  The defendants' unauthorized use of a plaintiff's identity for marketing purposes "falls directly" within this language, which "makes it clearer

38

than ever that § 43(a) is an appropriate vehicle for the assertion of the claim of falsely implying the endorsement of a product or service by a real person."  1 McCarthy, Rights of Publicity § 5:31.

The defendants argue--again, initially in their reply memorandum, see notes 16-17, 19, supra--that only a celebrity can maintain this sort of "false endorsement" claim under the Lanham Act, because any other plaintiff lacks a commercial interest in his or her identity akin to the trademark rights protected by the Act.[20]  They provide no authority directly supporting this view, however, citing instead a string of cases considering false endorsement claims by celebrities under the Lanham Act and observing that they are "not aware of any reported cases involving false endorsement claims that do not involve a celebrity."  The plaintiff, naturally, does not cite any such cases in her objection, since at the time she filed it the defendants had not yet made this argument.

---

[20]  In the alternative, the defendants argue that the plaintiff cannot succeed on her false endorsement claim under the Lanham Act because she has not alleged that her identity has commercial value that was diminished as a result of their actions.  But the court has already rejected that identical argument with regard to the plaintiff's state-law right of publicity claim, see Part II. B, supra, and the defendants do not provide any additional authority or argument suggesting that the same analysis would not also apply under the Lanham Act.

McCarthy, for one, believes that "under the proper circumstances, any person, celebrity or noncelebrity, has standing to sue under § 43(a) for false or misleading endorsements."  1 McCarthy, <u>Rights of Publicity</u>, § 5:22.  And there does not appear to be any authority from the First Circuit on this point one way or the other.  For purposes of this motion, then, the court rules that the plaintiff's claim for false designation under 15 U.S.C. § 1125(a)(1)(A) does not fail simply because she is not a "celebrity."

## **CONCLUSION**

For the foregoing reasons, the defendants' motion to dismiss (document no. 9) is GRANTED in part and DENIED in part as follows:  Counts II-VI and VIII of the complaint are dismissed in their entirety; Count I of the complaint is dismissed except insofar as it asserts a claim for violation of the plaintiff's right of publicity; and the motion is denied as to Count VII.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 27, 2008

cc:  W. E. Whittington, Esq.
     Ira P. Rothken, Esq.
     Jared R. Smith, Esq.
     James P. Bassett, Esq.
     Jeffrey C. Spear, Esq.